**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CMD GLOBAL PARTNERS (USA), LLC,<br>Plaintiff,<br>v.<br>WORKHORSE GROUP, INC.,<br>Defendant. | Case No. 1:25-cv-09298-MKV |

## AMENDED COMPLAINT

Plaintiff CMD Global Partners (USA), LLC ("*CMD*" or "*Plaintiff*"), hereby brings this Amended Complaint ("*Amended Complaint*") against the Defendant Workhorse Group, Inc. ("*Workhorse*" or "*Defendant*"). In support of this Amended Complaint, CMD states the following:

## NATURE OF THE ACTION

1. Plaintiff CMD provided investment banking and financial advisor services to Defendant Workhorse under an Engagement Letter for over a year, resulting in the desired outcome from CMD's engagement: a sale of Workhorse's Aero Division (the "*Aero Division*"), netting Workhorse substantial savings. Despite CMD's complete performance of all its obligations under the Engagement Letter, Workhorse has flagrantly breached its own obligations by failing to pay CMD the agreed-upon Workhorse Aero Transaction Success Fee (defined below) and expense reimbursement upon the closing of a Workhorse Aero Transaction (defined below).

2. CMD therefore brings this action seeking monetary damages from Workhorse for the amounts that CMD is contractually owed, totaling no less than $726,651.34, plus attorney's fees, costs, and interest.

## PARTIES

3. Plaintiff CMD Global Partners (USA), LLC is a Delaware limited liability company with its headquarters at 123 N. Wacker Drive, Suite 1375, Chicago, IL 60606.

4. Defendant Workhorse Group, Inc. (NAQ: WKHS) is a Nevada corporation with its headquarters at 3600 Park 42 Drive, Suite 160E, Sharonville, OH 45241.

## JURISDICTION AND VENUE

5. CMD brings this action under 28 U.S.C. § 1332(a), which states that "district courts shall have original jurisdiction for all civil actions where the matter in controversy exceeds the sum or value of $75,000 … and is between (1) citizens of different States; [or] (2) citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(1) – (a)(2).

6. 28 U.S.C. § 1332(a) requires "complete diversity," meaning that all plaintiffs must be citizens of states diverse from those of all defendants. *U.S. Liab. Ins. Co. v. M Remodeling Corp.*, 444 F. Supp. 3d 408, 409 (E.D.N.Y. 2020).

7. For purposes of diversity jurisdiction, the citizenship of a limited liability company ("*LLC*") is determined by the citizenship of each of its members and a plaintiff must allege the identity and citizenship of the LLC's members, proceeding up the chain of ownership until it has alleged the identity and citizenship of every individual corporation with a direct or indirect interest in the LLC. *Id.* at 410 (citing various cases).

8. Where the membership of a limited liability company includes a corporation, the party alleging diversity jurisdiction must identify the citizenship of the corporation. *Golden Bridge LLC v. 150-30 Ave. Realty LLC*, 2025 U.S. Dist. LEXIS 103381, at *6 (E.D.N.Y. May 30, 2025).

9. An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile. *Id.* at *8.

10. The citizenship of CMD is determined by examining the citizenship of each of its members.

11. CMD is an LLC with one member – CMD Global Partners HoldCo, LLC ("*HoldCo*"), which is incorporated in Delaware with its principal place of business in Chicago, Illinois. *See* Declaration of Daniel Haffner attached hereto as **Exhibit A**, ¶ 6 Exhibit 1.

12. HoldCo has two members – Mark C. Salamasick and Quarry Capital Ltd. *Id.* at ¶ 7, Ex. 1.

13. Mark C. Salamasick is an Illinois citizen domiciled in Illinois. *Id.* at ¶ 8, Ex. 1.

14. Quarry Capital Ltd. is an Irish corporation with its principal place of business in Dublin, Ireland. *Id.* at ¶ 9, Ex. 1.

15. Conor N. Barry serves as the sole director of Quarry Capital Ltd. and is an Irish citizen domiciled in Ireland. *Id.*

16. Workhorse is incorporated in Nevada, with its headquarters in Ohio. *See* Certificate of Designation attached hereto as **Exhibit B**; *see also* Workhorse Investor Relations Page, https://ir.workhorse.com/, (last visited Jan. 15, 2026) (identifying Workhorse HQ in Sharonville, Ohio).

17. Based on the citizenship of the parties detailed above, there is complete diversity of citizenship between the parties.

18. Personal jurisdiction and venue are proper because the parties have contractually consented to New York as the venue and governing law for any disputes related to the contract.

19. The amount in controversy in this Amended Complaint exceeds $75,000.

## FACTUAL ALLEGATIONS

20. CMD is an emerging financial advisory firm founded in 2019 by a group of experienced investment bankers who take on a selective number of engagements each year in order to provide a high level of attention and service to each engagement. CMD provides a variety of financial services, including investment banking services, financial advising, and soliciting offers from potential buyers in mergers and acquisitions.

21. Workhorse is an electric vehicle manufacturer of trucks and sprinter vans, which had an Aero Division until CMD assisted with a divestiture of that division.

22. In 2023, CMD submitted a proposal to assist Workhorse in selling some or all of its assets, business divisions, and subsidiaries related to its Aero Division, which produced unmanned aerial vehicles, more commonly known as drones, and associated systems.

23. Workhorse was interested in selling its Aero Division because this division was burning significant cash and was not generating substantial revenue.

24. The net cash burn for Workhorse's Aero Division was over $10 million in 2023 and was forecasted to be over $5 million in 2024.

25. As a result of the performance issues with the Aero Division, Workhorse engaged CMD to help Workhorse secure the best possible price for the division, even if that resulted in a "take the keys" transaction.

26. CMD advised Workhorse that it was selling a business that was burning significant cash and not yet generating substantial revenues.

27. Workhorse's management, President John Graber and CEO Richard Dauch, expressly acknowledged their understanding that a sale of the Aero Division was unlikely to yield

any return and agreed that shedding the Aero Division was still a favorable outcome because of Workhorse's dire financial situation and the high cash liability of that part of the business.

28. On December 1, 2023, Workhorse and CMD signed an engagement letter ("*Engagement Letter*"). A true and correct copy of the Engagement Letter is attached hereto as **Exhibit C**.

29. Under the Engagement Letter, CMD agreed to "act as investment banking representative" to Workhorse and agreed to provide "objective, independent analysis and advice to [Workhorse] and its Board of Directors in regard to strategic decisions and as it evaluates potential Transactions or certain other situations… [and] perform such financial advisory services as are customary and appropriate in connection with any potential Transactions and as you reasonably request, including assisting [Workhorse] in analyzing, structuring, negotiating and effecting potential Transactions."[1] Ex. C, § 1.

30. The Engagement Letter defined "Transactions" to include:

> (i) a "Change of Control Transaction," which results in an outside party controlling 50% or more of the Company, which may occur through any merger, an acquisition of a material portion of the Company's assets (which includes physical assets, intellectual property, trade secrets or other things of value owned by the Company) or becomes a creditor to the Company, any of which enable the outside party to determine or influence the actions or strategies of the Company, and/or (ii) any Non-Control Transaction resulting in the sale of any debt, equity or equity-linked securities that are below the 50% ownership threshold resulting in a Change of Control in the Company (each a "Non-Control Transaction"), and/or (iii) any Transaction involving Divestitures of a specific asset, business unit, subsidiary, etc., (each a "Divestiture Transaction").

Ex. C, ¶ 1.

---

[1] Unless otherwise specified or defined herein, any capitalized terms have the same meanings as in the Engagement Letter.

31. The Engagement Letter further outlined two separate Transactions covered by the terms of the Engagement Letter:

> (i) a Transaction involving the sale of all or part of "Workhorse Aero" … (the "Workhorse Aero Transaction"), and (ii) any Transaction directly or indirectly involving [REDACTED][2], [REDACTED] and/or their subsidiaries or affiliates, referred herein as the ("Relevant Parties") (each a "Relevant Parties Transaction" and, together with Workhorse Aero Transactions, each a "Transaction").

Ex. C, ¶ 2.

32. The Engagement Letter defined the assets to be sold in the Workhorse Aero Transaction (the "*WA Assets*") as "any subsidiary or related company of the Company or assets (including associated intellectual property) owned by the Company, directly or indirectly, which is involved in the manufacture or sale of vehicles commonly known as drones or unmanned aerial systems (UAS) and any associated systems." *Id.*

33. In exchange for CMD's services, the Engagement Letter outlined different fees that Workhorse agreed to pay CMD.

34. Workhorse agreed to pay CMD a monthly retainer fee of $25,000. Ex. C, § 2(a).

35. Furthermore, the Engagement Letter outlined different "Success Fees" based on the type of Transaction ultimately consummated. *See* Ex. C, §§ 2(b) – (f).

36. The Engagement Letter defined the Workhorse Aero Transaction Success Fee as:

> If, during the period the Firm is retained by the Company with the purpose of consummating a Workhorse Aero Transaction or within eighteen (18) months thereafter (the "Tail Period"), there is a Workhorse Aero Transaction, the Company agrees to pay the firm US $750,000 (the "Workhorse Aero Transaction Success Fee"). If the Firm is retained with the objective of consummating a Relevant Parties Transaction and if the Firm also receives a Success Fee for a Relevant Parties Transaction as defined below, the Company will

[2] The parties identified in this portion of the contract are not known to the public and therefore have been redacted in Exhibit C. The names of these parties do not impact the factual allegations in this Amended Complaint.

> instead pay a Workhorse Aero Transaction Success Fee equal to US $375,000.

Ex. C, § 2(b).

37. Workhorse also agreed to reimburse CMD "for its reasonable documented, out-of-pocket expenses" for its work under the Engagement Letter, including "travel costs, consulting fees, document production costs, data usage fees, research and other customary expenses for this type of assignment." Ex. C, § 3.

38. Following execution of the Engagement Letter, CMD immediately began working for Workhorse, undertaking, *inter alia*, the following work:

a. Drafting comprehensive marketing materials, including a detailed write-up of the Aero Division, an executive summary, and a confidential investor presentation;

b. Contacting over 120 prospective buyers of the Aero Division;

c. Circulating confidential information presentations to over 20 potential buyers;

d. Coordinating and holding discussions with management for over 15 potential buyers;

e. Creating, maintaining, and updating a virtual data room, working with Workhorse's management to add key documents to the data room as necessary, and providing data room access to potential buyers;

f. Holding regular calls with potential buyers and presenting key materials about the Aero Division to potential buyers; and

g. Providing Workhorse with analysis of potential buyers, including the feedback received from each buyer, and assessing the financial feasibility of the offers.

39. Eventually, through CMD's thorough, significant, prolonged, and concerted efforts, and with help and transaction support from the CMD team, Workhorse secured a binding Letter of Intent from ATW Partners ("*ATW*") to purchase the WA Assets (the "*ATW Offer*").

40. Following receipt of the ATW Offer, Workhorse asked CMD to assist Workhorse in completing the deal with ATW.

41. Among other services, CMD attended numerous calls between ATW and Workhorse, coordinated diligence request lists, facilitated data room access, aided in the exchange of information, and organized further discussions between Workhorse and ATW's corporate counsel.

42. In May 2024, Workhorse agreed to sell its entire Aero Division to ATW with a closing date scheduled for June 6, 2024.

43. On May 13, 2024, CMD sent its invoice to Workhorse for the Workhorse Aero Transaction Success Fee, indicating that it was owed not less than $750,000.

44. On May 15, 2024, CMD sent a message to Workhorse regarding outstanding out-of-pocket travel expenses incurred by CMD that had not been paid.

45. Workhorse's CEO, Dauch, responded: "You have my commitment to have the out-of-pocket expenses paid." A true and correct copy of the May 15, 2024 Dauch Email is attached hereto as **Exhibit D**.

46. On June 6, 2024 (the "*Closing Date*"), Workhorse closed on the sale of its Aero Division, including the WA Assets, to ATW.

47. As of the Closing Date, the Workhorse Aero Transaction Success Fee of $750,000, accrued monthly retainer fees, and reimbursement of out-of-pocket travel expenses were all still outstanding.

48. On June 12, 2024, CMD again invoiced Workhorse for all amounts owed under the Engagement Letter, including the Workhorse Aero Transaction Success Fee and the past-due monthly retainer fees for March, April, and May, which totaled $825,000 (the "*June 12 Invoice*"). A true and correct copy of the June 12 Invoice is attached hereto as **Exhibit E**.

49. After receiving the June 12 Invoice, Workhorse informed CMD that it was having liquidity issues.

50. CMD engaged in discussions with Workhorse to discuss Workhorse's liquidity issues and work out a way to pay CMD's invoice.

51. The unpaid monthly retainer fees were subsequently paid, leaving the Workhorse Aero Transaction Success Fee outstanding.

52. On July 8, 2024, Dauch sent an email to CMD explicitly acknowledging Workhorse's obligation to CMD in the context of discussing potential buyers, stating that said buyers "would allow us to settle our AP with CMD…". A true and correct copy of the July 8, 2024 Dauch Email is attached hereto as **Exhibit F**.[3]

53. On July 24, 2024, CMD and Workhorse executed the *First Amendment to the Engagement Letter*, which added two additional "Relevant Parties" for purposes of a "Relevant Parties Transaction" under the Engagement Letter ("*First Amendment*"). A true and correct copy of the First Amendment is attached hereto as **Exhibit G**.[4]

54. This First Amendment to the Engagement Letter expressly stated, "all other terms and conditions of the Engagement shall remain in full force and effect." *Id.*

55. After the Closing Date, CMD conducted substantial work on the Relevant Parties Transaction, including hosting numerous calls, facilitating discussions, conducting model reviews, and negotiating term sheets with the Relevant Parties, as defined in the Engagement Letter and First Amendment.

---

[3] The parties identified in this email are not known to the public and therefore have been redacted in Exhibit F. The names of these parties do not impact the factual allegations in this Amended Complaint.

[4] The parties identified in this portion of the contract are not known to the public and therefore have been redacted in Exhibit G. The names of these parties do not impact the factual allegations in this Amended Complaint.

56. On July 25, 2024, after CMD requested an update on its overdue and unpaid June 12 Invoice, the Chief Financial Officer of Workhorse, Robert Ginnan, explicitly acknowledged Workhorse's obligation to CMD by email, and offered to pay CMD the Workhorse Aero Transaction Success Fee in increments of $25,000 per week, with a total of $100,000 per month, until Workhorse was able to secure an M&A deal or received funds from ATW in late October 2024. A true and correct copy of the July 25, 2024 Ginnan Email is attached hereto as **Exhibit H**.

57. On that same date, CMD received a payment of $25,000 from Workhorse as a first payment towards the Workhorse Aero Transaction Success Fee.

58. On July 26, 2024, CMD responded to Ginnan's email, informing Workhorse that the $750,000 had become due on June 6, 2024, and that acceptance of any partial payment under Workhorse's proposed payment plan would not constitute a waiver of any of CMD's rights and remedies under the Engagement Letter, which CMD expressly reserved. A true and correct copy of the July 26, 2024 CMD email is attached hereto as **Exhibit I**.

59. No additional payments have been made to CMD since July 25, 2024.

60. Over the intervening months, CMD has made repeated attempts to work with Workhorse to receive payment for the unpaid balance of its June 12 Invoice.

61. On August 16, 2024, Dauch sent an email to CMD explicitly acknowledging the obligation, stating: "We are working to be able to draw another tranche of capital from ATW after the EC which will allow us to pay down some of our past due AR, including payments to CMD." A true and correct copy of the August 16, 2024 Dauch Email is attached hereto as **Exhibit J**.[5]

62. Throughout the following year, Dauch continued to make assurances to CMD that Workhorse would pay CMD the outstanding amounts owed under the terms of the Engagement

[5] The parties identified in this email are not known to the public and therefore have been redacted in Exhibit J. The names of these parties do not impact the factual allegations in this Amended Complaint.

Letter, including the contractually owed Workhorse Aero Transaction Success Fee, once Workhorse had sufficient capital.

63. On or around August 20, 2024, CMD invoiced Workhorse for $1,651.34 in travel expenses related to the Relevant Parties Transaction for which CMD was continuing to provide services to Workhorse (the "*August 20 Invoice*").

64. Despite not receiving payment from Workhorse on either the June 12 or August 20 Invoices, other than the single $25,000 payment made in July 2024, CMD continued to work in good faith with Workhorse's management to arrange meetings with prospective suitors, lenders, and investors, and to evaluate alternative capital arrangements for the Relevant Parties Transaction, including coordinating in-person meetings with the Relevant Parties in September 2024.

65. As a result of CMD's work in finding and facilitating the sale of Workhorse's Aero division, Workhorse has saved approximately $375,000 per month in operational costs, totaling at least $5.6 million in cost savings since the sale of the Aero Division. This extended Workhorse's financial runway and enabled it to focus on its core competency of EV production.

66. More than a year after CMD sent the June 12 Invoice, on July 14, 2025, Workhorse published a press release (the "*Workhorse Press Release*"), indicating that it was party to a forthcoming M&A transaction with an undisclosed company (the "*M&A Transaction*"). A true and correct copy of the Workhorse Press Release is attached hereto as **Exhibit K**.

67. On July 18, 2025, after over a year of patiently working with the Workhorse and receiving reassurances of eventual payment and anticipating that, following the M&A Transaction, Workhorse would finally have the capital to perform its obligation under the Engagement Letter, CMD sent Workhorse an invoice for $726,651.34, which included the remaining Workhorse Aero

Success Fee and the outstanding unpaid travel expenses (the "*July 18 Invoice*"). A true and correct copy of the July 18 Invoice is attached hereto as **Exhibit L**.

68. In September 2025, CMD's representatives spoke with Dauch by telephone, and Dauch explicitly affirmed Workhorse's understanding that it is obligated to pay CMD's fees pursuant to the terms of the Engagement Letter and stated that he was "a man of his word."

69. On September 15, 2025, CMD sent Workhorse's board of directors a formal demand for payment of the outstanding contractual Workhorse Aero Transaction Success Fee and CMD's unpaid out-of-pocket expenses (the "*Demand Letter*"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit M**.

70. On October 22, 2025, counsel for CMD sent an email to counsel for Workhorse demanding payment as a follow-up to the Demand Letter.

71. In response, counsel for Workhorse baselessly asserted that CMD is not entitled to the Workhorse Aero Success Fee, despite the plain language of the Engagement Letter, CMD having fulfilled its obligations thereunder by, among other things, securing the sale of the WA Assets to ATW, and Workhorse's repeated and express assurances to CMD to the contrary. *See* Exs. C, D, F, H, and J.

72. Despite persistent and good-faith efforts to obtain payment for its work, Workhorse has refused to pay CMD the contractually owed Workhorse Aero Transaction Success Fee and expense reimbursements.

**COUNT I – DECLARATORY JUDGMENT**

73. The Plaintiff incorporates all prior paragraphs as being realleged herein.

74. CMD and Workhorse are parties to the Engagement Letter pursuant to which CMD agreed to offer objective, independent analysis and advice to Workhorse and its board of directors

regarding strategic decisions, and as it evaluated potential Transactions. In exchange, Workhorse agreed to pay CMD certain fees and expenses.

75. CMD fulfilled all its obligations under the Engagement Letter and is entitled to payment of the Workhorse Aero Transaction Success Fee and reimbursement for expenses, all as outlined in the Engagement Letter.

76. Workhorse has disputed that CMD fully performed under the Engagement Letter and refused to pay the fees owed to CMD.

77. An actual justiciable controversy exists between CMD and Workhorse concerning the interpretation, performance, and effect of the Engagement Letter, specifically whether CMD performed as required and is entitled to the fees that Workhorse agreed to under the Engagement Letter.

78. This controversy is definite and concrete, and it affects the parties' present and substantial legal rights. It is not hypothetical or abstract.

79. A declaration is necessary to clarify and settle the parties' rights and obligations under the Engagement Letter.

80. **WHEREFORE**, CMD seeks a judgment declaring that: (1) CMD fully performed its obligations under the Engagement Letter; (2) the sale of the WA Assets to ATW constituted a Workhorse Aero Transaction under the Engagement Letter; and (3) CMD is entitled to the Workhorse Aero Transaction Success Fee and reimbursement for expenses.

## **COUNT II – BREACH OF CONTRACT**

81. The Plaintiff incorporates all prior paragraphs as being realleged herein.

82. The Engagement Letter, including the First Amendment, is a valid and enforceable contract between CMD and Workhorse.

83. CMD fulfilled its obligations under the Engagement Letter by offering objective, independent analysis and advice to Workhorse and its board of directors in regard to strategic decisions as it evaluated potential Transactions. Ex. C, ¶ 1.

84. Specifically, CMD undertook the following work:

a. Drafting comprehensive marketing materials, including a detailed write-up of the Aero Division, an executive summary, and a confidential investor presentation;

b. Contacting over 120 prospective buyers of the Aero Division;

c. Circulating confidential information memorandums from over 20 potential buyers;

d. Coordinating and holding discussions with management for over 15 potential buyers;

e. Creating, maintaining, and updating a virtual data room, working with Workhorse's management to add key documents to the data room as necessary, and providing data room access to potential buyers;

f. Holding regular calls with potential buyers and presenting key materials about the Aero Division to potential buyers; and

g. Providing Workhorse with analysis on potential buyers, including the feedback received from each buyer, and assessing the financial feasibility of the offers.

85. Workhorse has repeatedly acknowledged its obligation to pay the fees and expenses owed under the Engagement Letter. *See* Exs. D, F, H, and J.

86. Workhorse breached its obligations under the Engagement Letter by refusing and failing to pay CMD the remaining $725,000 of the $750,000 Workhorse Aero Transaction Success Fee and reimbursement for $1,651.34 in out-of-pocket expenses.

87. As a result of Workhorse's breaches, CMD has suffered damages of not less than $726,651.34.

88. **WHEREFORE**, Plaintiff CMD seeks monetary damages of not less than $726,651.34, plus attorney's fees, costs, and interest, and additional damages to be determined at trial.

**COUNT III – QUANTUM MERUIT**
**(In the Alternate)**

89. The Plaintiff incorporates all prior paragraphs as being realleged herein.

90. CMD performed valuable services for Workhorse in good faith.

91. Specifically, CMD undertook the following work:

a. Drafting comprehensive marketing materials, including a detailed write-up of the Aero Division, an executive summary, and a confidential investor presentation;

b. Contacting over 120 prospective buyers of the Aero Division;

c. Circulating confidential information memorandums from over 20 potential buyers;

d. Coordinating and holding discussions with management for over 15 potential buyers;

e. Creating, maintaining, and updating a virtual data room, working with Workhorse's management to add key documents to the data room as necessary, and providing data room access to potential buyers;

f. Holding regular calls with potential buyers and presenting key materials about the Aero Division to potential buyers; and

g. Providing Workhorse with analysis on potential buyers, including the feedback received from each buyer, and assessing the financial feasibility of the offers.

92. Workhorse accepted CMD's services and consummated a Transaction that was the direct fruit of CMD's work for Workhorse.

93. At all times, CMD expected compensation for its services to Workhorse.

94. As a result of CMD's services, in the year following CMD's performance, Workhorse saved approximately $375,000 per month in operational costs, totaling at least $5.6 million in cost savings since the sale of the Aero Division. These savings extended Workhorse's financial runway and enabled it to focus on its core competency of EV production.

95. The compensation that CMD seeks is thus commensurate with the services CMD rendered to Workhorse.

96. **WHEREFORE**, CMD seeks no less than $726,651.34, plus attorney's fees and costs, with interest, as equitable compensation for the services CMD rendered to Workhorse.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the reasons set forth herein, Plaintiff CMD Global Partners (USA), LLC seeks:

A. Declaratory Judgment declaring that (i) CMD has performed its obligations under the Engagement Letter; (ii) the sale of the WA Assets to ATW constituted a Workhorse Aero Transaction under the Engagement Letter; and (iii) Workhorse is obligated to pay CMD the full and complete amount of the Workhorse Aero Transaction Success Fee and reimbursement for all out-of-pocket expenses;

B. Monetary damages as a result of Workhorse's breach of the Engagement Letter; and

C. Such other and further relief as the Court deems proper.

Date: January 16, 2026

Respectfully Submitted,

/s/ Jason J. Ben
Jason J. Ben
**Tucker Ellis LLP**
233 South Wacker Drive, Suite 6950
Chicago, IL 60606
jason.ben@tuckerellis.com

and

Harley Goldstein
Ainsley Moloney (*admission forthcoming*)
Josh Grenard (*admission forthcoming*)
**Goldstein & McClintock LLLP**
One World Trade Center, Suite 8500
New York, NY 10007
harleyg@restructuringshop.com
ainsleym@goldmclaw.com
joshg@goldmclaw.com

*Co-Counsel to Plaintiff*